K2 SETTLEMENT, LLC,                          )
                                             )
                 Plaintiff,                  )
                                             )
        v.                                   ) Civil Action No. 11-0191
                                             )
CERTAIN UNDERWRITERS AT LLOYD'S,             )
LONDON, AND JOHN DOES, MKL, CSL,             )
AUL and CRE,                                 )
                 Defendants.                 )

## MEMORANDUM

Gary L. Lancaster,                          November 20, 2012
Chief Judge.

This is a breach of contract and bad faith action. Plaintiff, K2 Settlement, LLC ("K2"), alleges that defendants, Certain Underwriters at Lloyd's, London, and John Does, MKL, CSL, AUL, and CRE (collectively, "Underwriters") agreed to indemnify K2 against certain risks pursuant to an insurance bond contract, and that Underwriters failed to meet their obligations under that bond. K2 further alleges that Underwriters violated Pennsylvania's Bad Faith insurance statute, 42 Pa. C.S. § 8371.

Underwriters moved for summary judgment on both the breach of contract and bad faith claims. They argue that K2's coverage claim was barred by the terms of the parties' insurance bond agreement. K2 also moved for summary judgment on the breach of contract claim, arguing that the undisputed facts show that Underwriters breached a duty to indemnify K2 for a covered loss.

undisputed facts show that Underwriters breached its duty to indemnify K2 for a covered loss [doc. no. 59].

For the reasons set forth below, the court will grant Underwriters' motion for summary judgment and deny K2's motion for partial summary judgment.

I.    FACTUAL BACKGROUND

The following facts are taken from the parties' concise statements of material facts and are undisputed, unless otherwise noted.    Additional facts may be discussed elsewhere in this memorandum in context, where appropriate.

K2 is insured under a Special Mortgage Bankers Bond (Certificate No. SUA 3581) (the "Bond"), effective May 29, 2009 through May 10, 2010, which was issued by Stateside Underwriting Agency.    Underwriters subscribed to the Bond.    K2 notified Underwriters of a claim for losses under the Bond in the amount of $482,963.28, resulting from the misconduct of one of its employees, Kandi Jablonski.    Underwriters eventually denied coverage for that loss by letter dated November 22, 2010.

## A. The K2 - PASS - Jablonski Relationship

K2 was formed as the result of an informal business plan formulated by certain members of NPF Holding Company, LLC, which owned a 90% membership interest in New Penn Financial, LLC, a national mortgage lender. Kandi Jablonski was chosen to run the day-to-day operations of the newly formed title insurance business. Jablonski was experienced in the title business, and came to the attention of those forming K2 through her affiliation with PA Settlement Services, Inc. ("PASS"). At all relevant times, Jablonski was the president and sole shareholder of PASS.

K2 and K2 Holding, LLC ("K2 Holding") were formed on April 30, 2009. Upon formation, K2 Holding began setting up K2. K2, however, could not begin operations until it obtained the personnel, physical assets, licenses, and title underwriter approvals necessary to conduct its planned title business.

Jablonski was hired and named K2's president. She executed an employment agreement and an operating agreement, both of which were effective July 1, 2009, which was her date of hire. Jablonski remained the president and sole owner of PASS after she was hired by K2.

At the same time that K2 was formed, K2, PASS, and Jablonski entered into an Agreement for the Purchase and Sale of Assets ("Asset Purchase Agreement"). Under the Asset Purchase Agreement, K2 purchased certain assets and assumed specifically

3

identified liabilities of PASS for the purpose of obtaining PASS's workforce, operating systems, furniture, equipment, and office.

The Asset Purchase Agreement states, in part:

[K2] desires to purchase and [PASS] desires to sell certain of [PASS's] assets, which [K2] will thereafter use to engage in the Title Insurance Business. The parties additionally wish to provide for the ongoing assistance of [Jablonski] and [PASS] to [K2] until such time as [K2] obtains all required licenses, registrations and qualifications in those states in which [K2] intends to engage in the Title Insurance Business.

[doc. no. 58, Ex. 2, at 1].

K2 did not begin conducting any title business until after the Asset Purchase Agreement was executed and the assets were transferred from PASS to K2. PASS did not immediately cease operations as a result of the asset acquisition. Instead, as contemplated by the Asset Purchase Agreement, Jablonski continued to operate PASS in order to wind down its existing business and to conduct title business in those jurisdictions where K2 had not yet acquired the required licensure, title underwriter approvals, bonding, or certifications needed to begin operations there.[1] During this transition period, Jablonski was the president of both K2 and PASS and was responsible for the day-to-day operations of both entities.

---

[1]     The parties dispute the extent to which PASS continued its business after the Asset Purchase Agreement. However, these facts are not material to the motions before the Court and the terms of the Agreement speak for themselves.

4

The Asset Purchase Agreement specifically addressed the continuing operations of PASS and provides, in part:

> [K2] shall have no right to manage and no control over [PASS's] operations following the Closing (other than the right to direct [PASS] to curtail operations in certain jurisdictions as provided above), and shall not engage in such management or control, and [PASS] agrees that it shall conduct its operations in the Pending Jurisdictions only in the ordinary and normal course, consistent with past practice and in compliance with all applicable laws. Other than [K2's] agreement to pay overhead expenses as provided above, [PASS] shall be solely responsible for all expenses, costs, taxes and liabilities arising from [PASS's] operations in the Pending Jurisdictions.

[doc. no. 58, Ex. 2 at 7].

## B.  The Escrow Accounts and Jablonski's Misconduct

As an entity involved in the title business, K2 was required to maintain title escrow accounts to receive and disburse funds deposited by mortgage lenders in connection with the closing and recording of individual residential mortgage loans.  K2, as the settlement agent and trustee of escrow funds, could disburse such funds only upon the closing of the mortgage loan and in accordance with the loan documents and mortgage lender's instructions, or as otherwise specifically directed by the mortgage lender.

Jablonski, as K2's president and employee, and the licensed title agent of record, was responsible for accessing and managing K2's escrow accounts, and for authorizing transactions from K2's escrow accounts. Jablonski was able to access and control the K2 escrow accounts only because of her status as a K2 employee and authorized signer on the accounts. During the transition period, K2 and PASS, with one exception explained immediately below, maintained separate title escrow accounts at different banks.

When K2 began doing business in Virginia, it was required under Virginia law to maintain a title escrow account at a Virginia bank for loans closed on Virginia property. Because the bank that K2 was otherwise doing business with did not then do business in Virginia, Jablonski, as president of K2, opened the required escrow account at the bank where PASS maintained its Virginia escrow account. PASS's account and K2's account were originally set up as wholly separate accounts. However, due to the consolidation of banking institutions, the two accounts later became "linked", thus allowing users of the K2 and PASS Virginia escrow accounts to transfer funds between them.

After a November 2009 audit revealed unauthorized uses of K2's escrow accounts and a shortage in the PASS escrow account, an investigation was conducted by Dan Egan, a manager of K2, and others. That investigation revealed that, in operating PASS,

Jablonski failed to properly maintain and reconcile the PASS escrow account. Specifically, Jablonski was able to maintain the appearance of a solvent account by depositing checks and wires for new closings to replace disbursed funds. As PASS wound down its business, fewer funds were deposited in the escrow account and the negative balance in the account could no longer be concealed. Jablonski then, without authorization, began to conceal the PASS escrow account shortage by disbursing loans being closed by PASS with funds from the K2 escrow account. Jablonski would then account for these unauthorized disbursements by depositing checks in the K2 escrow account that were drawn against the PASS escrow account. Jablonski was the only K2 officer or owner who knew of this activity.

At some point, no later than October 5, 2009, the funds in the PASS escrow account became insufficient to cover the checks drawn against it and deposited in the K2 escrow account. By the time the unauthorized disbursements were discovered by K2, Jablonski had disbursed $258,057.83 from the K2 escrow account for the purpose of closing PASS loans.

The investigation also revealed that, in October 2009, Jablonski's bank login credentials were used to conduct unexplained transfers from K2's Virginia escrow account to PASS's Virginia escrow account. These transfers totaled $224,905.45 and were

7

conducted without the knowledge or authority of any other K2
officer or owner.[2]

After completing its investigation, K2 determined that it
had sustained a direct financial loss as a result of Jablonski's
misconduct. Therefore, K2 submitted a claim to Underwriters under
the Bond. Underwriters, for the reasons at issue in this lawsuit,
have not paid K2's claim for losses resulting from the unauthorized
disbursements, i.e., $258,057.83, or the unauthorized transfers,
i.e., $224,905.45.

## C. Terms of the Bond

Underwriters issued the Bond to NPF Holding LLC and New
Penn Financial LLC as Assureds. K2 was added as an "Additional
Named Insured" effective May 20, 2009. [doc. no. 58, Ex. 3, at
45]. Insuring Clause 1 and Condition B are central to resolving
the motions now before the Court, and therefore, they have been
reproduced below.

Insuring Clause 1 of the Bond provides, in relevant part:

The Underwriters hereby undertake and agree, subject
to the terms, definitions, exclusions, limitations,
conditions and endorsements of this Bond, to indemnify
the Assured for…

Direct financial loss sustained by the Assured
subsequent to the Retroactive Date and discovered by
the Assured during the Bond Period by reason of and
directly caused by

---

[2]     Underwriters dispute the admissibility of these findings, which argument
the court addresses. See pp. 17-18, infra.

(a) dishonest acts by any Employee of the Assured,
whether committed alone or in collusion with
others, which dishonest acts were committed by
said Employee with the manifest intent to obtain
and resulted in the receipt of Improper Personal
Financial Gain for said Employee, or for the
person(s) acting in collusion with said Employee
. . . ..

[doc. no. 58, Ex. 3, at 11].

The Bond's Definitions section explicitly states that the
term "Improper Personal Financial Gain . . . does not include
salary, fees, commissions, bonuses, salary increases, promotions,
profit sharing and other emoluments or similar benefits." [doc.
no. 58, Ex. 3, at 19].

Condition B provides, in relevant part:

If the Assured shall, during the Bond Period, merge
or consolidate with, or purchase, another
institution, with or without occasioning any change
in ownership or control of the Assured, the Assured
shall not have any coverage under this Bond for loss
which

(a) has occurred or may subsequently occur
in offices or premises, or

(b) has been caused or may subsequently be
caused by any partner, director or
employee of said institution, or

(c) has arisen or may subsequently arise out
of the assets or liabilities, acquired
by the Assured as a result of such
consolidation, merger, or purchase of
assets unless the Assured shall

(i) obtain the written consent of
the Underwriters to extend
some or all of the coverage
provided by this Bond, and

9

(ii) give written notice to the
                         Underwriters of its agreement
                         to the terms required for
                         said coverage, and

                    (iii) pay to the Underwriters any
                          additional premium.

[doc. no. 58, Ex. 3, at 21].


II.        LEGAL STANDARD

            Fed. R. Civ. P. 56(a) provides that summary judgment
may be granted if, drawing all inferences in favor of the non-
moving party, "the movant shows that there is nc genuine dispute as
to any material fact and the movant is entitled to a judgment as a
matter of law."

            The mere existence of some factual dispute between the
parties will not defeat an otherwise properly supported motion for
summary judgment. A dispute over those facts that might affect the
outcome of the suit under the governing substantive law, i.e., the
material facts, however, will preclude the entry of summary
judgment.    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986). Similarly, summary judgment is improper so long as the
dispute over the material facts is genuine. Id. In determining
whether the dispute is genuine, the court's function is not to
weigh the evidence or to determine the truth of the matter, but
only to determine whether the evidence of record is such that a

                                 10

reasonable jury could return a verdict for the nonmoving party. Id. at 248-49.

To demonstrate entitlement to summary judgment, defendant, as the moving party, is not required to refute the essential elements of the plaintiff's cause of action. Defendant needs only point out the absence or insufficiency of plaintiff's evidence offered in support of those essential elements. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Once that burden has been met, plaintiff must identify affirmative evidence of record that supports each essential element of his cause of action. If plaintiff fails to provide such evidence, then he is not entitled to a trial, and the defendants are entitled to summary judgment as a matter of law.

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the evidence is so one-sided that the movant must prevail as a matter of law.

III.    DISCUSSION

K2 contends that it is entitled to judgment as a matter
of law because the Bond provides for indemnification of the losses
caused by Jablonski.  Underwriters contend that judgment as a
matter of law should be entered in its favor because: (1) the Bond
does not cover losses caused by employees of an acquired
institution; and (2) Jablonski did not receive an "Improper
Personal Financial Gain".  As to K2's bad faith claim, Underwriters
argue that it must fail as a matter of law because the undisputed
evidence establishes that they had valid reasons for denying
coverage, making the claim not viable under Pennsylvania law.


A.    Applicable Law

In interpreting the language of an insurance contract,
the "goal is to determine the intent of the parties as exhibited by
the contract provisions."  Burton v. Republic Ins. Co., 845 A.2d
889, 893 (Pa. Super. Ct. 2004).[3]  The court "must accord the
contract provisions their accepted meanings, and . . . cannot
distort the plain meaning of the language to find an ambiguity."
Id.  "A provision of an insurance contract is 'ambiguous' if

---

[3]    The parties do not dispute that Pennsylvania law applies to this action.

reasonably intelligent people could differ as to its meaning."
Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881, 885 (Pa. Super.
Ct. 2000). "Where a provision of an insurance policy is ambiguous,
it will be construed in favor of the insured." Id.

### B. Condition B

According to Underwriters, Condition B of the Bond
precludes coverage in this case because it states that there is no
coverage for losses caused by employees of entities acquired by K2.
Underwriters argue that PASS was acquired by K2, making Jablonski's
misconduct fall within the coverage exemption of Condition B
because she was a former employee of PASS who only became
associated with K2 after K2 acquired PASS. In contrast, K2 argues
that the Asset Purchase Agreement by which it purchased certain
PASS assets did not qualify as a merger, consolidation, or purchase
under Condition B, making that coverage exemption inapplicable.

To reiterate, Condition B reads, in relevant part: "If
the Assured shall, during the Bond Period, merge or consolidate
with, or purchase, another institution, with or without occasioning
any change in ownership or control of the Assured, the Assured
shall not have any coverage under this Bond for loss which . . .
has been caused or may subsequently be caused by any partner,
director or employee of said institution". The parties do not
dispute that K2 is an Assured and that the losses occurred during

13

the Bond Period. Therefore, the dispositive issue governing whether Condition B precludes coverage is whether K2 merged with, consolidated with, or purchased PASS.

The Bond does not explicitly define the terms merge, consolidate, and purchase, and thus we are to give those terms their ordinary meaning. See Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004). Black's Law Dictionary defines a merger as "[t]he absorption of one organization (esp. a corporation) that ceases to exist into another that retains its own name and identity and acquires the assets and liabilities of the former." BLACK'S LAW DICTIONARY 1009 (Eighth Ed. 2004). Consolidate is defined as "[t]o unite (two or more corporations or other organizations) to create one new corporation or other organization." Id. at 327. Purchase, defined as "[t]he act or instance of buying," must be understood in context as the "purchase of another institution." See id. at 1270.

The terms used in Condition B of the Bond uniformly indicate situations in which there is a total acquisition of a target company, which company ceases to exist after the transaction. The Asset Purchase Agreement, however, does not accomplish such a transaction. First, K2 did not purchase the entirety of the PASS business. For example, the Agreement characterizes the transaction as the sale of "certain . . . assets" to K2. In addition, it contains an Exhibit specifically listing assets that are excluded from the transaction. Second, PASS did

14

not cease to exist as a business after the transaction. For
example, the Agreement presumes the continued operation of PASS by
stating that "[K2] shall have no right to manage and no control
over [PASS's] operations following the Closing". In addition, the
Agreement explicitly provided for PASS to continue its operations
in jurisdictions where K2 was not yet licensed. These examples
show that the Asset Purchase Agreement did not achieve a total
acquisition of PASS by K2, or a termination of PASS's operations.
Based on the plain language of Condition B and the ordinary meaning
of the terms merge, consolidate, and purchase of an institution, no
reasonable juror could conclude that Condition B bars coverage for
Jablonski's conduct.[4]

## C. Insuring Clause 1

Having found that no reasonable juror could conclude that
K2's claim is barred by Condition B, we will now address whether
K2's claim is barred as a matter of law because it fails to meet
the requirements of Insuring Clause 1. Underwriters contend that
K2 has failed to produce any evidence to establish that Jablonski
intended to profit from the transactions at issue, or that the
losses in fact resulted in her receipt of any Improper Personal
Financial Gain. K2 argues that, as the sole owner of PASS, all

---

[4] Even if the court were to accept Underwriters' argument that the Asset Purchase
Agreement constituted a de facto merger, K2's reasonable alternative
interpretation would create an ambiguity that we would resolve in favor of K2,
leading to the same ultimate conclusion on this point.

15

benefits received by that entity automatically passed through to Jablonski. K2 also argues that Jablonski benefitted directly because she reduced her own personal liability by misappropriating funds in order to maintain the solvency of the PASS escrow accounts.

To reiterate, Insuring Clause 1 provides coverage to K2 for "dishonest acts by any Employee of the Assured… which… were committed by said Employee with the manifest intent to obtain and resulted in the receipt of Improper Personal Financial Gain for said Employee". K2, as the insured, has the burden of proving both that: (1) Jablonski acted with manifest intent to obtain Improper Personal Financial Gain; and (2) her conduct resulted in her receipt of Improper Personal Financial Gain. See Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996) ("In Pennsylvania, the insured bears the burden of proving facts that bring its claim within the policy's affirmative grant of coverage").

"[T]he 'manifest intent' of [an] employee should be ascertained by deciding his true purpose in causing the loss." Susquehanna Bancshares, Inc. v. Nat'l Union Fire Insurance Co. of Pittsburgh, 659 A.2d 991, 998 (Pa. Super. Ct. 1995). "[B]oth direct and circumstantial evidence should be considered, including the employee's own testimony as to his purpose as well as any

16

evidence indicating the employee knew the loss was substantially certain to be the result of his acts." Id.

Although the record contains no direct testimony from Jablonski from which a jury could determine her intent, her conduct provides circumstantial evidence of the same. Even viewing the evidence in the light most favorable to K2, no reasonable juror could conclude that the losses suffered by K2 were the result of unintended consequences of Jablonski's sound business judgment. Instead, a reasonable juror could only conclude that Jablonski knew that the losses suffered by K2 were substantially certain to be the result of her actions, thus satisfying the intent element of Insuring Clause 1. A review of the record before us compels this result.

For instance, according to Egan's investigation, Jablonski caused funds from K2 accounts to be disbursed for the purpose of closing PASS loans. That investigation also found that Jablonski's bank login credentials were used to directly transfer funds from a K2 account to a PASS account. It is implausible that Jablonski took these affirmative and repeated actions, yet was unaware that they would result in losses to the K2 escrow account.

Underwriters' argument that this evidence is not admissible because Egan had no personal knowledge of Jablonski's intent and was not personally involved in the transactions is unavailing. Egan's affidavit is an out of court statement that

recounts the findings of an investigation into Jablonski's conduct. The court may, however, consider evidence at summary judgment in a form inadmissible at trial, if that evidence is reducible to an admissible form. Robinson v. Hartzell Propeller Inc., 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004). Because Egan would be able to testify at trial regarding his investigation, the court will consider his affidavit at this stage. See Williams v. Borough of West Chester, Pa., 891 F.2d 458, 466 n.12 (3d Cir. 1989) ("[A]n affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony"). Furthermore, Egan's findings are independently supported by bank records, which were submitted along with K2's Sworn Statement in Proof of Loss. [doc. no. 58, Ex. 7]. As such, we find that no reasonable juror could find that K2 has failed to satisfy the first element of Insuring Clause 1, i.e., proving that Jablonski acted with manifest intent to profit from the transactions.

The next question is whether K2 has adduced sufficient evidence to show that Jablonski, in fact, received an Improper Personal Financial Gain from the unauthorized disbursements and transfers. We conclude that no reasonable juror could find, based on the record before us, that Jablonski received an Improper Personal Financial Gain as a result of her misconduct. Although there is undisputed evidence that the unauthorized disbursements

18

and transactions occurred, and that Jablonski was the sole shareholder of PASS, we find that K2's arguments that Jablonski personally received a financial benefit from the transactions are entirely speculative.

K2's only evidence that Jablonski received an Improper Personal Financial Gain is found in paragraph 28 of the Egan Affidavit:

> As the president and 100% shareholder of PASS, Jablonski could be held personally liable if the funds in her PASS Escrow Account were not sufficient enough to allow PASS to meet its obligations on the loan transactions closed by PASS. Based on my experience in the mortgage lending industry and Title Business, I am aware that the state law in many states require [sic] a bond to be posted by the company engaged in the Title Business. The surety underwriting the bond almost always requires indemnity from the principal of the business. . . . In PASS's case, I am aware that PASS maintained the required statutory bonds because NPF would not have done business with PASS if it were not bonded . . .. Shortages in an escrow account would also impact Jablonski's ability to maintain her relationship with title underwriters, which is necessary to conduct business as a title agent.

[doc. no. 71, Ex. B-1, at ¶ 28 (emphasis added)]. Even assuming that avoiding personal liability for losses constitutes personal financial gain, Egan's testimony is too speculative to support a reasonable jury inference that Jablonski would have been personally liable for insufficient funds in PASS accounts. Egan avers that Jablonski "could" be held personally liable and that sureties underwriting bonds "almost always require[]" principals, like Jablonski, to indemnify them. No reasonable juror could draw inferences based on Egan's speculation regarding Jablonski's

19

indemnity obligations. See Robertson v. Allied Signal, Inc., 914
F.2d 360, 382 n.12 (3d Cir. 1990) ("[A]n inference based upon
speculation or conjecture does not create a material factual
dispute sufficient to defeat entry of summary judgment"). As such,
the record is devoid of any evidence that would permit a reasonable
jury to find that Jablonski received an Improper Personal Financial
Gain as a result of her misconduct.[5]

Because K2 has failed to meet its burden of adducing
evidence to establish that Jablonski received an Improper Personal
Financial Gain, no reasonable juror could find that K2 has met the
coverage requirements under Insuring Clause 1 of the Bond. On this
basis alone Underwriters are entitled to summary judgment on K2's
breach of contract claim.

## D. Bad Faith Claim

Underwriters have also moved for summary judgment on K2's
state law bad faith claim. Underwriters argue that no reasonable
juror could conclude that their denial was made in bad faith given
that the undisputed facts establish that K2 had not met the
requirements under Insuring Clause 1 that would have triggered

---

[5] While it might be inferred that the unauthorized disbursements and transfers
allowed PASS to stay in business longer than it otherwise would have, and that
Jablonski would necessarily have benefited financially as PASS's sole
shareholder, any financial benefit in this vein would not trigger coverage
because the Bond's definition of Improper Personal Financial Gain specifically
excludes "salary, fees, commissions, bonuses, salary increases, . . . profit
sharing and other . . . similar benefits[.]"  [Doc. No. 58, Ex. 3, at 19].

coverage. K2 contends that Underwriters' argument must fail because K2 is entitled to coverage under the Bond.

Under Pennsylvania law, "bad faith is present if the insurer did not have a reasonable basis for denying benefits under the policy and . . . the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." Johnson v. Progressive Ins. Co., 987 A.2d 781, 784 (Pa. Super. Ct. 2009). This must be established by clear and convincing evidence. Id. Because the court has concluded that no reasonable juror could conclude that K2 is entitled to coverage under the Bond, it follows that K2 could not meet this legal standard. Therefore, we grant summary judgment in favor of Underwriters on the bad faith claim.

## IV.    CONCLUSION

For the foregoing reasons, Underwriters' motion for summary judgment is granted and K2's motion for partial summary judgment is denied. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| K2 SETTLEMENT, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-0191 |
| | ) |
| CERTAIN UNDERWRITERS AT LLOYD'S, | ) |
| LONDON, AND JOHN DOES, MKL, CSL, | ) |
| AUL and CRE, | ) |
| Defendants. | ) |

## ORDER

AND NOW, this _30_ day of November, 2012, upon consideration of the parties' cross motions for summary judgment, IT IS HEREBY ORDERED THAT Underwriters' motion for summary judgment [Doc. No. 56] is GRANTED and K2's motion for partial summary judgment [Doc. No. 59] is DENIED.

The Clerk of Courts is directed to mark this case CLOSED.

BY THE COURT:

_____, C. J.

cc:     All Counsel of Record